**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 96-11436**
_____


**TERRY WILSON; JAN WILSON,**

**Plaintiffs-Appellants,**

**versus**

**ROLLINS, INC.; ORKIN EXTERMINATING, INC.,**

**Defendants-Appellees.**

_____

**Appeal from the United States District Court**
**for the Northern District of Texas**
**(3:94-CV-0192-G)**
_____

September 29, 1997

Before DUHÉ and BARKSDALE, Circuit Judges, and COBB, District Judge.[1]

PER CURIAM:[2]

For this FED. R. CIV. P. 54(b) appeal in a diversity action, Jan and Terry Wilson challenge the judgment as a matter of law in favor of Rollins, Inc., and Orkin Exterminating, Inc., on the Wilsons' fraud and intentional infliction of emotional distress claims; and

---

[1]    District Judge of the Eastern District of Texas, sitting by designation.

[2]    Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the denial of relief on their declaratory judgment claim, which sought reformation of non-compete covenants.  We **AFFIRM** and **REMAND**.

I.

In January 1992, after lengthy negotiations, Rollins purchased for $380,000 the assets of JTW, Inc., located in Texas and owned by the Wilsons.  JTW consisted of a commercial interior plantscaping business, managed by Mrs. Wilson; and a wholesale supplier of plants and related goods, managed by Mr. Wilson.

In conjunction with the sale of JTW's assets, the Wilsons entered into five-year employment contracts with Orkin, wholly-owned by Rollins.  Those contracts provided for an annual base salary of $40,000 for each of them, contained covenants not to compete with Orkin, and provided for termination for cause.  And, JTW and the Wilsons executed non-competition agreements.

Mr. Wilson was placed initially in January 1992 as manager of plantscaping supply; he was removed from that position that May and accepted a position as a national sales manager.  That December, Orkin eliminated his position because it was not generating enough revenue to pay his salary.  He was then offered the option of either accepting a greenhouse manager position at a lower salary or returning to the national sales position on a straight commission basis.  Mr. Wilson accepted the greenhouse manager position, and Orkin continued to pay him $40,000 annually.

At the end of September 1993, Orkin decided to close the greenhouse facility and to cease unprofitable wholesale and greenhouse operations. Mr. Wilson was given the option of being terminated for cause, resigning, taking back his former business, or accepting a new position and pay cut. He refused each option.

In mid-October, Orkin advised Mr. Wilson that there were no suitable positions in Texas and that he probably would be assigned to California. Orkin later offered him an entry level position on a delivery and installation crew. Mr. Wilson refused that offer for medical reasons. Orkin also offered him his former position as a national sales manager, but he refused that position because it had been eliminated previously when he was unable to achieve its goals. As of 30 November 1993, Mr. Wilson considered himself constructively discharged; Orkin, that he abandoned his employment.

Mrs. Wilson began her employment with Orkin in January 1992 as a branch manager, at an annual salary of $40,000. That November, she was reassigned as a major account specialist; although her compensation was changed from a salary to a "guaranteed draw", the amount was not changed. In July 1993, her compensation was decreased after Orkin put her on a commission basis. She was still employed by Orkin at time of trial in early 1996.

The Wilsons and JTW filed this diversity action against Orkin and Rollins in January 1994, claiming breach of contract and fraud. The Wilsons also claimed intentional infliction of emotional

distress; and they sought a declaratory judgment that the non-compete covenants should be reformed.

In mid-January 1996, the declaratory judgment request was tried to the court, while the other claims were tried to a jury. The jury awarded $100,000 to Mrs. Wilson and $150,000 to Mr. Wilson for fraud, and $200,000 to Mrs. Wilson for breach of contract; found in favor of Rollins and Orkin on JTW's claims for breach of contract, fraud, and exemplary damages; but did not reach a verdict on the Wilsons' claims for emotional distress and exemplary damages, and on Mr. Wilson's claim for breach of contract.

The district court granted judgment as a matter of law against the Wilsons on their fraud, emotional distress, and exemplary damages claims; remitted Mrs. Wilson's breach of contract damages to $52,000 (*which she accepted*); and ruled that Mr. Wilson would be allowed to retry his breach of contract claim. It denied a declaratory judgment, and, along that line, refused the Wilsons' request for findings and conclusions.

## II.

Our court denied the Wilsons' petition for leave to take an interlocutory appeal, but held that the appeal could proceed under Rule 54(b). JTW dismissed its appeal.

This being a diversity action, Texas substantive law applies. *E.g.*, **Erie R. Co. v. Tompkins**, 304 U.S. 64 (1938); **Vaught v. Showa Denko K.K.**, 107 F.3d 1137, 1145 (5th Cir. 1997). And, concerning

- 4 -

this limited Rule 54(b) appeal, although the appellees contended in their brief that the district court erred by denying them judgment on Mr. Wilson's contract claim, they conceded at oral argument that the issue is not properly before us. Likewise, neither is the same claim by Mrs. Wilson. In sum, at issue is only whether the district court erred by granting judgment against the Wilsons' fraud and emotional distress claims, and by denying relief on the non-compete claims.

### A.

For the fraud and emotional distress issues, the judgments as a matter of law are reviewed *de novo*. *E.g.*, **Conkling v. Turner**, 18 F.3d 1285, 1300-01 (5th Cir. 1994). Such judgment is appropriate if, viewing the trial record in the light most favorable to the Wilsons, there is no "legally sufficient evidentiary basis" for a reasonable jury to find for the Wilsons. **Id**. (quoting FED. R. CIV. P. 50(a)); *see also* **Boeing Co. v. Shipman**, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), *overruled in part on other grounds*, **Gautreaux v. Scurlock Marine, Inc.**, 107 F.3d 331 (5th Cir. 1997).

### 1.

Judgment was granted against the fraud claims on the ground that they sounded only in contract. The Wilsons contend that the jury verdict should be reinstated because the legal analysis

applied by the district court is inapplicable to claims for fraudulent inducement.[3]

The proper legal analysis is provided by *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, ___ S.W.2d ___, 40 Tex. Sup. Ct. J. 877, 1997 WL 378129 (Tex. 1997), decided the day after we heard oral argument (but not yet released for publication in the permanent law reports and therefore subject to revision or withdrawal). There, the Texas Supreme Court clarified when tort damages may be recovered for fraudulent inducement of a contract. It noted that "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations"; that "it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself"; that it had "repeatedly recognized that a fraud claim can be based on a promise made with no intention of

---

[3]    The appellees contend that the Wilsons did not properly *plead* a fraudulent inducement claim. To the contrary, they alleged that "Defendants made misrepresentations and promises in which it [*sic*] had no intention to keep" in connection with the ongoing operation of Mr. Wilson's wholesale business, and that the defendants committed fraud by, *inter alia*, making "promises and representations without intention of honoring them" and "to induce Plaintiffs into the transaction and acquire their customer base". In any event, and far more importantly, the jury was instructed, without objection, that "[a] misrepresentation may also include a promise of future performance made with a present intent on the part of the person making the promise not to perform as promised." *See* FED. R. CIV. P. 15(b), 51.

performing, irrespective of whether the promise is later subsumed within a contract"; and that it was clearly established that "tort damages are not precluded simply because a fraudulent representation causes only an economic loss". *Id*. at *6. The court concluded that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Id*. at *7.

In the new light of *Formosa*, the district court erred by concluding that the Wilsons' claims sound only in contract. Of course, this does not end our inquiry; we also must determine whether legally sufficient evidence supports the jury's (1) finding of fraud and (2), if it does, award of damages. *See id*. *See also, e.g., Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997) ("We must affirm a judgment of the district court if the result is correct, even if our affirmance is upon grounds not relied upon by the district court.")

Under Texas law, a fraud claim requires proof of "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa*, 1997 WL 378129, at *7 (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)).

- 7 -

"A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Id*. (citing *Schindler v. Austwell Farmers Co-op.*, 841 S.W.2d 853, 854 (Tex. 1992)). Thus, to recover for fraudulent inducement, the Wilsons "had to present evidence that [the wrongdoer] made representations with the intent to deceive and with no intention of performing as represented." *Id.* (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986)).

The Wilsons contend that the appellees made the following representations, upon which they relied in deciding to sell the assets of their business (JTW) and enter into the employment agreements and covenants not to compete: (1) that, as part of the overall transaction, the appellees would pay a total of $800,000 (later adjusted downward $20,000 based on an audit), with $380,000 paid in cash through an asset purchase agreement and the remaining $400,000 through five-year employment contracts with the Wilsons, totaling $80,000 per year; (2) that the appellees did not care how the Wilsons apportioned the annual $80,000; (3) that the appellees wanted to use the plant supply business operated by Mr. Wilson to purchase and supply all of the appellees' tropical foliage, blooming color, and hardgoods on a national basis, and that they wanted him to manage that operation; and (4) that the Wilsons could

only be terminated according to Orkin's "corrective action report" procedures, and it would be almost impossible for them to be fired.

The Wilsons contend that such representations were false when made, because the appellees never wanted Mr. Wilson as an employee and never intended to give him a realistic chance to succeed; instead, they offered to purchase his part of JTW and offered him a position because they knew it was the only way they could persuade the Wilsons to sell Mrs. Wilson's part of JTW, and because they could obtain the recurring revenues of her part at a lower cost if they purchased his part of JTW. The Wilsons assert that Orkin never intended to perform under their employment agreements, because (1) the appellees intentionally failed to inform the Wilsons prior to the closing that they had already negotiated with another company to supply tropical foliage and blooming color; (2) they were treated rudely, and given unreasonable and unrealistic goals and deadlines; and (3) Orkin reduced their salaries in an attempt to force them to resign.

But, as the appellees correctly point out, the Wilsons cannot maintain a claim for fraudulent inducement of the sale of JTW's assets. The Asset Purchase Agreement was a separate document, executed by Mrs. Wilson on behalf of JTW; the Wilsons in their individual capacities executed separate employment contracts and covenants not to compete. (Along this line, Rollins paid the agreed $380,000 for JTW's assets; the jury found that the Asset

Purchase Agreement was not breached and that there was no fraud as to JTW; and JTW dismissed its appeal.)

The Wilsons have not cited any authority allowing them to recover individually for the alleged fraudulent inducement of the sale of *corporate* assets. Indeed, Texas law is to the contrary. *See **Adams v. Big Three Industries, Inc.***, 549 S.W.2d 411, 413 (Tex. App.—Beaumont 1977, writ ref'd n.r.e.) ("A corporation cannot be used when it benefits the stockholders and officers and be disregarded when it is to the advantage of the organizers to do so."). The Wilsons chose to operate their business as a corporation, and they are bound by that choice. Accordingly, their only viable fraudulent inducement claim relates to the employment contracts.

Based on our review of the record, we conclude that there is insufficient evidence to support finding fraudulent inducement of those agreements. Prior to entering into them, the Wilsons signed a letter of intent describing the terms of the contracts; it provides that should either accept another position, the terms of employment may be renegotiated. And, the employment contracts executed by the Wilsons provided that their responsibilities "shall include such duties consistent with [his/her] position with the Company as may from time to time be assigned to [him/her] by the Division General Manager". Accordingly, the employment contracts did not guarantee the Wilsons particular positions with Orkin,

irrespective of their performance. Indeed, Mrs. Wilson acknowledged, on cross-examination, that she understood when she signed the employment agreement that her position with Orkin could be changed.

As noted, Mrs. Wilson was still employed by Orkin at time of trial; this hardly constitutes evidence of Orkin's intent not to perform. Although her salary did not remain at $40,000 annually after she became a major account specialist, she had the opportunity to earn more than that through commissions. *See Formosa*, 1997 WL 378129, at *7 ("the mere failure to perform a contract is not evidence of fraud").

There is some evidence to support the contention that Orkin did not want to employ Mr. Wilson and that Rollins was not interested in his wholesale business. A witness, who also sold her business to the appellees, testified that Orkin's vice president of national sales told her that Orkin never wanted Mr. Wilson's side of the business, and that Orkin "forced [him] out". Likewise, another former owner, still employed by Orkin at time of trial, testified that the only reason the appellees purchased Mr. Wilson's part of the business was to get the recurring revenues of Mrs. Wilson's part, that they had never been interested in his wholesale business, and that he was simply an expense of doing business.

Nevertheless, Orkin entered into an employment contract with Mr. Wilson, continually offered him other positions when his

performance did not meet its expectations, and paid him $40,000 annually until 30 November 1993, when he refused to accept other positions offered to him. Orkin's vice president of corporate development testified that, had Mr. Wilson accepted either of the positions available to him through Orkin's final offer, it would have continued to pay him $40,000 annually, regardless of whether it lost money in so doing. Needless to say, Orkin was under no obligation to continue an unprofitable wholesale operation solely for the benefit of Mr. Wilson. Considering all of the evidence, a rational juror could not find that Orkin had no intent to perform under Mr. Wilson's employment agreement at the time it was executed.

In sum, judgment as a matter of law against the fraud claims was correct.

### 2.

As for the judgment as a matter of law on the emotional distress claims, "[u]nder Texas law, the tort of intentional infliction of emotional distress has four elements: (1) intentional or reckless conduct; (2) that was extreme or outrageous; (3) that caused emotional distress; (4) that was severe." *Atkinson v. Denton Pub. Co.*, 84 F.3d 144, 151 (5th Cir. 1996) (citing *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993)). "Only conduct that is 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of human decency, and to be regarded as

atrocious and utterly intolerable in a civilized community' will satisfy the second element of the tort of intentional infliction of emotional distress." *Id*. (quoting *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir. 1989)). Moreover, this extreme and outrageous element is a question of law. *Wornick*, 856 S.W.2d at 734; *Atkinson*, 84 F.3d at 151.

Judgment was granted on the basis of this second element; the district court held that there were no facts "which would take what the defendants did out of the realm of an ordinary employment dispute and transform it into 'extreme and outrageous' conduct". This second element is our starting point.

The Wilsons contend that this is not an ordinary employment dispute, but is unique because (1) they were fraudulently induced into employment as part of a fraudulent scheme to obtain "their" assets; (2) having fraudulently induced them into employment, the appellees attempted to force them into quitting or accepting lower salaries by subjecting them to unwarranted criticism, unreachable goals, and rude treatment; (3) they were not at-will employees, but instead were protected by written employment agreements providing for termination for cause; (4) because of the covenants not to compete, they could not leave to avoid harassment, without changing careers or moving from their home; and (5) the appellees, which had subjected them to psychological evaluations during contract negotiations, used knowledge so gained to take advantage of their

- 13 -

particular susceptibilities to emotional distress. Concerning these contentions, several additional points of law form the backdrop against which the evidence on this issue is reviewed.

First, the Wilsons' fraudulent inducement claims have been rejected, as has the assertion that JTW's assets are "their" assets.

Second, regarding the abusive criticism, goals, and treatment points, our court stated in *Johnson v. Merrell Dow Pharmaceuticals, Inc.*, 965 F.2d 31 (5th Cir. 1992): "In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees." *Id*. at 34; *see also* **Atkinson**, 84 F.3d at 151 (as a matter of law, employee's allegations that he was terminated without warning after long service, that employer published false and defamatory reasons for his termination to people inside company, and that his superiors were disrespectful or rude to him during his employment and in the termination meeting, are not extreme and outrageous). "Rude behavior does not equate to outrageousness, and behavior is not outrageous simply because it may be tortious." *Ewald v. Wornick Family Foods Corp.*, 878 S.W.2d 653, 660 (Tex. App.—Corpus Christi 1994, writ denied). Likewise, "[l]iability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions." *Ward v. Bechtel Corp.*, 102 F.3d 199, 203 (5th Cir. 1997).

And third, as for the harassment and non-at-will points, the Wilsons' attempt to distinguish their situation on the basis that they could only be terminated for cause is unavailing. Obviously, although at-will employees are not protected by employment contracts, their employers are still prohibited from taking adverse employment actions against them proscribed by Title VII and other applicable laws. Nevertheless, we have held that "[a]n employer's conduct, even if a Title VII violation, rises to the level of extreme and outrageous in only the most unusual cases." *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 400 (5th Cir. 1996) (internal quotation marks and citation omitted); *see also* *Hadley v. VAM P T S*, 44 F.3d 372, 375 (5th Cir. 1995) (fact that jury awarded compensatory damages under Title VII does not mean that it also found that plaintiff suffered compensatory damages for intentional infliction of emotional distress); *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993) ("Even conduct which may be illegal in an employment context may not be the sort of conduct constituting extreme and outrageous conduct").

Against this backdrop, and based on our review of the evidence for this emotional distress claim, we note, for starters, that the Wilsons do not cite, nor do we find, evidence that the psychological evaluation information was used improperly against them. For the balance of the contentions, we agree with the district court that the requisite "extreme and outrageous" element

is lacking. Accordingly, we need not analyze the other three elements comprising the claim; it fails.

B.

In a claim tried to the court, the Wilsons sought a declaration that the non-compete covenants were unreasonable and should be modified. The court ruled that their request for findings and conclusions was untimely *and without an evidentiary basis*, and that reformation of the covenants was not a remedy available to them. The Wilsons contend that (1) there is no basis for the untimely-request ruling and, in any event, FED. R. CIV. P. 52(a) required the court to make findings and conclusions; (2) they introduced evidence as to the unreasonableness of the covenants and submitted a brief detailing such evidence; and (3) the employment agreements expressly provide for reformation of the covenants in the event they are found to be unreasonable. Two documents contain the covenants.

First, the non-competition agreements were in effect for five years after 2 January 1992. Those covenants have expired according to their own terms; any claims regarding them are moot. Second, the employment agreements preclude competition for two years following *either* expiration of the five-year term of employment or earlier termination. Because Mr. Wilson was last employed by Orkin in November 1993, his two-year covenant has also expired. Mrs. Wilson, however, is still bound by her covenant; because she has

not worked for Orkin since the January 1996 trial, it does not expire until January 1998 (needless to say, relatively soon).

As noted, the covenants-claim was tried to the court. In February 1995 (nearly a year before trial), the Wilsons filed corresponding proposed findings and conclusions. "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon...." FED. R. CIV. P. 52(a). Regarding the court not making findings and conclusions, we are unable to discern the bases for its untimely-request ruling. Nevertheless, assuming that this non-compliance with Rule 52(a) is error, it is harmless; Mrs. Wilson fell far short of producing sufficient evidence of unreasonableness.

## III.

For the foregoing reasons, the rulings comprising the Rule 54(b) judgment are **AFFIRMED** and this matter is **REMANDED** to the district court for further proceedings.

*AFFIRMED and REMANDED*